## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE BROOKS GROUP &** | : | |
| **ASSOCIATES, INC.** | : | **CIVIL ACTION** |
| **Plaintiff** | : | **12-2922** |
| | : | |
| **v.** | : | |
| | : | |
| **WENDI LEVIGNE, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

**RUFE, J.**                                                                                    **APRIL 15, 2014**

### INTRODUCTION

Before the Court are cross-motions for summary judgment filed by Plaintiff the Brooks Group, Third Party Defendant Paul Brooks (referred to collectively throughout this Memorandum Opinion as "Brooks"), and Defendants and Third Party Plaintiffs Wendi LeVigne and the Brannan Group.

For the reasons that follow, the motions will be granted in part and denied in part.

## I.       Background

The Brooks Group & Associates, Inc., provides marketing research, management consulting, and training and development services to its clients. Paul Brooks is the CEO. Wendi LeVigne is a consultant who worked as an independent contractor with the Brooks Group from November 25, 2007, until December 31, 2011. Ms. LeVigne owns the Brannan Group, and the Brooks Group alleges that all the money it paid in consideration for Ms. LeVigne's services was paid (at Ms. LeVigne's request) to Brannan.

Ms. LeVigne was paid $10,000 per month plus commissions of up to 20% for accounts she opened with clients of the Brooks Group. After her relationship with the Brooks Group

ended, she sought to collect commissions she believed were owed to her. She also continued to practice as a consultant and worked for at least one former client of the Brooks Group, a fact that the Brooks Group learned because it discovered emails addressed to Ms. LeVigne demonstrating her relationship with the former client. Ms. LeVigne counters that this client and others solicited Ms. LeVigne's services and that the Brooks Group and Mr. Brooks improperly obtained the emails from her private email accounts.

The Brooks Group sued Ms. LeVigne for breaching a non-solicitation clause in her independent contractor agreement ("ICA") with the Brooks Group. The Brooks Group also alleges that Ms. LeVigne stole the Brooks Group's intellectual property after she ceased to be an independent contractor, and that she held herself out as the creator of the intellectual property. These allegations form the basis of the nine causes of action that the Brooks Group has brought against Ms. LeVigne. The Brooks Group has moved for summary judgment as to liability on each of the nine causes of action. Ms. LeVigne has cross-moved for summary judgment on all nine claims.

Defendants counterclaimed against the Brooks Group and brought a third-party complaint against Paul Brooks. They allege that Ms. LeVigne is owed commissions and that it was the Brooks Group that misappropriated Ms. LeVigne's intellectual property. Defendants also allege that the Brooks Group and Mr. Brooks wrongly accessed Ms. LeVigne's email in violation of 18 U.S.C. §§ 2701 and 2707, analogous Pennsylvania statutes, and the federal and state constitutional rights to privacy. Defendants have moved for summary judgment on their counterclaim against the Brooks Group related to the commissions. The Brooks Group and Mr. Brooks have moved for summary judgment on all the third-party claims and all the

counterclaims except those related to the commissions and alleged misappropriation of intellectual property.

## II.     Threshold Legal Matters

### A.     *Jurisdiction and Choice of Law*

The Brooks Group's Complaint alleges violations of federal and state law; likewise, the counterclaims and third-party claims sound in federal and state law. All the claims form a part of the same case or controversy—the dispute between Ms. LeVigne and the Brannan Group on the one hand and Brooks on the other over the conduct, conclusion, and aftermath of their business relationship. This Court therefore has federal question jurisdiction[1] and supplemental jurisdiction over the state law claims.[2]

The ICA's choice-of-law clause provides that Pennsylvania law governs the contract.[3] As for the other state common law claims, Pennsylvania law governs, too. Federal courts apply the choice of law rules of the state where they sit,[4] and "Pennsylvania law provides that the place having the most interest in the problem and which is the most intimately concerned with the outcome is the forum whose law should be applied."[5] The parties chose Pennsylvania law to govern their contractual relationship, and since they rely on Pennsylvania law in their briefing, there is no dispute that Pennsylvania law governs. Defendants are citizens of California, but the parties' various claims arise out of Defendants' work with the Brooks Group, a corporation

---

[1] 28 U.S.C. § 1331.

[2] 28 U.S.C. § 1367(a).

[3] ICA at ¶ 8.5, Doc. No. 55-2 at 7. The ICA states that the agreement "shall be construed in accordance with the substantive laws of . . . Pennsylvania," but it is silent on the question of disputes between the parties that do not turn on construction of the ICA.

[4] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

[5] *PECO Energy Co. v. Boden*, 64 F.3d 852, 855 (3d Cir. 1995) (internal quotation marks omitted).

incorporated, headquartered, and having its principal place of business in Pennsylvania. Pennsylvania is more intimately concerned with this case than California because the dispute arises out of the conduct of a relationship entered into for the purposes of serving customers here on behalf of a corporation headquartered and incorporated here, while California has little interest how its citizens conduct business elsewhere.

      B.     *Standard of Review*

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[7] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8] In the event that a party who will bear the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case," Rule 56 "mandates the entry of summary judgment" against that party.[9]

      C.     *Materials to be Considered*

In supporting a factual position, a party must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."[10] Defendants complain that the Brooks Group's

---

[6] Fed. R. Civ. P. 56(a).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[8] *Id.*

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[10] Fed. R. Civ. P. 56(c)(1)(A).

evidence in support of its motion is unaccompanied by a sworn declaration or affidavit and therefore "not 'presented in a form that would be admissible in evidence.'"[11] For this proposition, Defendants quote Federal Rule of Civil Procedure 56(c)(2), but leave out a key word from that Rule, which allows a party to object that the other party "***cannot***" produce admissible evidence to support its factual position. Defendants essentially object that the Brooks Group has not accompanied its moving papers with a declaration that the exhibits attached thereto are true and correct. Since Defendants have offered no reason to believe the exhibits are not what they purport to be, it is of no moment that they are unsworn. Defendants' blanket objection is not that the Brooks Group "cannot" present its support for factual positions in the form of admissible evidence; instead, they have made an unfounded attack on all of the Brooks Group's evidence based on the absence of a sworn declaration accompanying the exhibits. Therefore, there is no reason before the Court to disregard the exhibits the Brooks Group has proffered.

For their part, Defendants have submitted a great deal of argument in the form of declarations by their counsel. For example, the Declaration of Daniel Sweetser attached to Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment states, "Rather than pay what was owed, Brooks Group 'struck first' by filing this Action against Ms. LeVigne and Brannan Group."[12] This "briefadavit" is plainly inappropriate for a declaration in support of a summary judgment motion.[13] Counsel may not avoid a court's page limits by couching argument in a "declaration." Defense Counsel further attached to his own improper declarations several exhibits that may be relevant to the disposition of the summary judgment

---

[11] Doc. No. 68 at 3 (quoting Fed. R. Civ. P. 56(c)(2)).

[12] Doc. No. 67-2 at ¶ 8.

[13] *McCarthy v. Kelner, Pecoraro & Kelner, P.C.*, 10-cv-6559, 2012 WL 833018, at *2 (D.N.J. Mar. 12, 2012).

motion. This Court will disregard the fact that the exhibits should have been attached to Defendants' Motion or the briefs in support of it (or in opposition to the Brooks Group's Motion), and consider these exhibits as permitted by Rule 52(c)(3).[14]

Defendants are not alone in embedding arguments in purported "exhibits" to their summary judgment papers. The Brooks Group has attached as "Exhibit O" to its Response to Defendants' Motion for Summary Judgment its own view of the commissions owed or not owed to Ms. LeVigne.[15] Although the chart is a helpful distillation of the Brooks Group's position, it is plainly not evidence.

Therefore, in ruling on these cross-motions for summary judgment, the Court will consider the arguments in the briefs in support of the parties' respective positions and the exhibits attached thereto that could represent admissible evidence. The Court will not consider arguments by counsel in the form of declaration or exhibits; the only arguments that will be considered are those that appear in counsels' briefs.

## III.    Disposition of the Cross-Motions

In total, this Memorandum Opinion resolves twenty-six claims that a party is entitled to summary judgment. The Court will rule first on the various allegations that Ms. LeVigne or the Brooks Group breached the ICA and were unjustly enriched in the course of their relationship. Then, the Court will discuss the claims founded on the Computer Fraud and Abuse Act and Electronic Communications Privacy Act (as well as the constitutional privacy claims). Next are the Brooks Group's other allegations that do not address the same facts or sound in the same

---

[14] "The Court need consider only the cited materials, but it may consider other materials in the record."

[15] Doc. No. 65.

legal theories as the previous claims: fraud, violation of the Lanham Act, and unfair competition. The Court will resolve last the Brooks Group's claims against the Brannan Group.

A.    Contract Claims

1.    Non-Solicitation/Non-Competition Clauses

To evaluate the Brooks Group's breach of contract claim it is first necessary to construe the awkwardly drafted relevant clauses. They read:

> [D]uring the term of this Agreement with Corporation and for a period of twenty-four (24) months after termination of such Agreement, for any reason whatsoever, Consultant will not, directly or indirectly, induce, invite, solicit or attempt to induce, invite or solicit (i) any customer of Corporation to discontinue doing business with Corporation, or (ii) provide any products or services which are competitive with the products or services offered by the Corporation to any customer of Corporation (a) with whom Consultant had contact during the Term, or (b) who was introduced to Consultant by Corporation . . . .[16]

There is clearly a drafting error here because the clause beginning with "(ii)" cannot grammatically follow from "solicit," the last word before "(i)." For the purposes of this motion the Court reads clause (i) as beginning with the first "induce," and clause (ii) as beginning where it does already.[17] Clause (i) is thus a non-solicit, and clause (ii) is a non-compete.

The Brooks Group complains that Ms. LeVigne worked for non-customers of the Brooks Group during the term of the ICA. As stated above, the ICA prohibits solicitation of "any customer *of Corporation* to discontinue doing business with Corporation."[18] The non-solicit

---

[16] ICA at ¶ 6.2, Doc. No. 55-2 at 5.

[17] "Under ordinary contract law, the scrivener's error doctrine allows a court to modify language in an agreement to conform the actual intent of the parties at the time of contract formation." *Stanford, Jr. v. Foamex L.P.*, 07-cv-4225, 2010 WL 3488651, *2 (E.D. Pa. Aug. 31, 2010); *cf. Presson v. Com. Mut. Fire Ins. Co. of Pa.*, 366 Pa. 436, 438 (1951) ("[T]here is not a word of evidence to support a finding that [a certain number used in a contract] was anything other than a typographical error or, at worst, an innocent mistake. The question involved was, therefore, one of law for the court."). This Court's construction of the ICA fails to resolve the grammatical problem with clause (iii), not at issue in this motion, which does follow syntactically after "solicit," but for the purposes of this opinion, it is simpler to move the romanette (i) to before "induce" than to move all of clause (ii) to the end of the sentence.

[18] ICA at ¶ 6.2, Doc. No. 55-2 at 5 (emphasis added).

clearly prohibited Ms. LeVigne only from soliciting customers *of the Brooks Group*. As if the clause were not clear enough, there is an express non-exclusivity clause in the ICA, too: "both parties remain free to enter into similar agreements with third parties."[19] Pursuant to the plain terms of the agreement, Ms. LeVigne clearly did not breach the ICA by performing work for a non-Brooks customer.

The Brooks Group also reads into the contract a provision that any outside work Ms. LeVigne performed needed to be disclosed to the Brooks Group. Notably, there is no express disclosure requirement. The Brooks Group extrapolates this provision from the non-exclusivity clause, which provides that "both parties remain free to enter into similar agreements with third parties. However, this will materially affect the compensation as outlined in Exhibit A, and payment to the Consultant will be renegotiated commensurate with the level of work performed."[20] Exhibit A provides, among other things, "You will receive incentive payments from the Partners for project work performed. This is not a set amount, and will vary depending on the intensity, difficulty, duration, and speed of work performed."[21] The non-exclusivity provision anticipates that if Ms. LeVigne did less work than expected because of the time she spent on non-Brooks Group work her pay would be materially affected. Exhibit A provides for variable incentive compensation. These provisions dovetail, and the Court will not draft a disclosure requirement into the contract.

The ICA also prohibited Ms. LeVigne from soliciting "any person who is an employee or agent of Corporation to . . . work for . . . [a] business entity which competes, directly or

---

[19] *Id.* at 1–2.

[20] *Id.* at 4–5.

[21] *Id.* at 8.

indirectly, with Corporation."[22] The Brooks Group complains that Ms. LeVigne used an employee of the Brooks Group on a certain project for one of Ms. LeVigne's customers who was not a Brooks Group customer. In support, the Brooks Group quotes a deposition where Ms. LeVigne stated that Stacey Shebesta worked on a project with her.[23] The parties do not dispute that Shebesta is an employee of the Brooks Group.

The Brooks Group's allegations regarding Shebesta are inadequate to support awarding it summary judgment on its breach of contract claim. The Brooks Group has failed to put forward evidence that would force a reasonable factfinder to conclude that Ms. LeVigne solicited Shebesta to work with an entity that competes with the Brooks Group.[24] The fact that the Brannan Group, which Ms. LeVigne owns, serviced the same clients as the Brooks Group supports the inference that Ms. LeVigne and the Brooks Group compete, however, so Ms. LeVigne is not entitled to summary judgment on this claim either.[25]

The Brooks Group also contends that Ms. LeVigne's solicitation of work from two companies named EMD Serono and Sunovion breached the non-solicit. Ms. LeVigne testified at her August 2012 deposition that she gave a "Capabilities Presentation" to EMD Serono and Sunovion in April (presumably April 2012 given the date of the deposition).[26] EMD Serono and

---

[22] *Id.* at 5.

[23] Levigne Dep. Tr. 48:2–8. Doc. No. 65-2 at 78.

[24] *See Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 506 (1976). Ms. LeVigne does not argue that the clause is unenforceable, and so for the purposes of this opinion, the Court assumes it is enforceable.

[25] Ms. LeVigne also argues that she is entitled to summary judgment on this claim because soliciting Shebesta to work for her was not a "material breach" of the agreement. Doc. No. 67 at 13. Ms. LeVigne misunderstands the doctrine of material breach. As the very case Ms. LeVigne relies upon states, "a material breach by one party to a contract entitles the non-breaching party to suspend performance." *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003). But materiality is not an element of a contract claim. Again, *Widmer Engineering* held, despite the fact that the seller's breach was immaterial, *id.* at 468, "the court properly determined that seller breached the agreement . . . [and] buyer is entitled to interest on those amounts from the time seller withheld payment." *Id.* at 469–70.

[26] LeVigne Dep. at 103:17–20, Doc. No. 69-1 at 43.

Sunovion were both Brooks Group customers with whom Ms. LeVigne had contact during the ICA term.[27] From the version of the presentation that the Brooks Group attached to its moving papers, the presentation does appear to advertise the capabilities of Ms. LeVigne's company, but the Brooks Group has not produced evidence that would force a factfinder to conclude that Ms. LeVigne was soliciting any customer "to discontinue doing business with" the Brooks Group. A factfinder could reasonably conclude that she was indifferent about whether the customer continued to do business with the Brooks Group, so long as it also did business with Ms. LeVigne. Thus, the Brooks Group cannot prevail at summary judgment on its claim that Ms. LeVigne breached the non-solicit (clause (i)). However, a factfinder could also infer that because Ms. LeVigne advertised her services to a Brooks Group customer that she was seeking to convince the customer to abandon the Brooks Group in favor of her, and therefore Defendants are not entitled to summary judgment on this claim.

The record is similarly insufficient to conclude as a matter of law that Ms. Levigne breached the non-compete clause. That clause forbade Ms. LeVigne to "provide any products or services which are competitive with the products or services offered by the Corporation to any customer of Corporation." It is a genuine issue of material fact whether the specific services that Ms. LeVigne provided to Sunovion—the only client that the parties have identified that she worked for after the Term—competed with the Brooks Group's services. Again, the fact that Ms. LeVigne and the Brooks Group shared some clients, including Sunovion, supports the inference that the services of each competed with those of the other, but without knowing specifically what services either party provided or could provide to Sunovion, the Court cannot conclude whether the parties were in competition in this instance. However, the overlapping clients are sufficient to

---

[27] *Id.* at 37:25–38:10; 38:22–24, Doc. No. 65-2 at 76.

withstand Ms. LeVigne's motion for summary judgment. Neither Ms. LeVigne nor the Brooks Group can prevail at summary judgment on the claim that Ms. LeVigne breached the non-compete (clause (ii)).

Summary judgment will not be entered in favor of either party on the claimed breaches of the non-solicit and non-compete.

## 2. Misappropriation of Intellectual Property[28]

The Brooks Group claims that Ms. LeVigne used confidential information in violation of the ICA. The ICA defines "Confidential Information" as "any and all information, material or trade secrets which is proprietary to Corporation, whether in print, electronic or other format, whether or not owned or developed by Corporation, which is not generally known to the public, and which Consultant may obtain through any direct or indirect contact with Corporation."[29] The next paragraph in the ICA provides that "Consultant understands and acknowledges that the Confidential Information has been developed or obtained by Corporation by the investment of significant time, effort and expense, and that the Confidential Information is a valuable, special and unique asset of Corporation which provides Corporation with a significant competitive advantage, and needs to be protected from improper disclosure."[30]

---

[28] This claim is included in Count I of the Amended Complaint only by a liberal reading and acceptance of an "incorporation by reference" of sixty-five paragraphs followed by a conclusory statement that "Defendants' acts constitute a breach of the Agreement." Pl.'s Am. Compl. at ¶¶ 66, 68. The breach of contract count in the amended complaint otherwise focuses exclusively on Ms. LeVigne's alleged breach of the non-solicit. The Brooks Group's summary judgment papers more fully develop the argument that she breached the contract by misappropriating intellectual property. Defendants complain that this claim was not pursued in the Brooks Group's Summary Judgment Motion, but it was. *See* Pl.'s Mot. S.J., Doc. No. 58 at 2 ("Plaintiff is entitled to Summary Judgment on Liability on its Claim of Defendants' Improper Acquisition and Use of Proprietary Information"). Because the claim is in the summary judgment motion and Ms. LeVigne does not argue that it is missing from the complaint, the Court sees fit to rule on this part of the motion for summary judgment on the merits of the claim.

[29] ICA at ¶ 6.1.1, Doc. No. 55-2 at 5.

[30] *Id.* at ¶ 6.1.2.

These paragraphs are not a model of clarity, but evidently Confidential Information is at least 1) not known to the public and 2) obtained from the Corporation. The Confidential Information that the Brooks Group points to are exhibits C through H to its Motion for Summary Judgment, Exhibit L, and Exhibits S-1 and S-2.

Exhibits C through H and L are all slides from PowerPoint presentations. The Brooks Group asserts multiple times in its summary judgment papers that these presentations are Confidential Information within the meaning of the ICA, but it never explains why. Ms. LeVigne avers that she created these files and therefore did not obtain them from the Brooks Group and therefore they are not Confidential Information within the meaning of the ICA. Since the Brooks group fails to point to any evidence from which a factfinder could infer that these slides are proprietary, the slides do not create a genuine issue of material fact.

Exhibits S-1 and S-2 are printouts of folders in a Dropbox[31] account that contain several files. Ms. LeVigne testified (and the Brooks Group does not contradict) that this Dropbox account was created in the course of this litigation "[i]n order to respond to [discovery] requests."[32] Ms. LeVigne testified that some of the material in the Dropbox account was the Brooks Group's intellectual property.[33] The Brooks Group invites the Court to infer that these files contained "Confidential Information," but points to absolutely no factual support for that proposition. As Ms. LeVigne notes, the Brooks Group has access to all these files and yet does not make any argument that the contents of any particular file amount to Confidential

---

[31] Dropbox is an online storage service that allows users to access stored files from any computer or other device with internet access.

[32] LeVigne Dep. 53:10, Doc. No 68-1 at 11.

[33] *Id.* at 55:9–11.

Information. Therefore, the Brooks Group has failed to create a genuine issue as to a material fact about the misappropriation of intellectual property claim.

Because there is no basis for a factfinder to conclude that any of the information of the Dropbox account is Confidential Information within the meaning of the ICA and the Brooks Group would bear the burden at trial on this claim, summary judgment will be entered in favor of Defendants on this claim.

3.      Commissions

Defendants claim that Ms. LeVigne is entitled to $212,135 plus interest for various projects she alleges she originated for the Brooks Group. The Brooks Group received some of these payments before the ICA terminated and some afterwards.[34] Defendants argue first that Ms. LeVigne's contract with the Brooks Group unambiguously entitled her to a commission of 20% of the value of the sales she generated; second that as a matter of law she was entitled to her commissions when the sales were made and not when the work was completed; and third that she generated sales in several projects outlined in her briefing.[35]

The Brooks Group responds that Ms. LeVigne was only entitled to a 10% commission at the time the sale was made and another 10% after completion. Furthermore, the Brooks Group argues that most of the projects for which Defendants claim Ms. LeVigne is owed compensation have not been completed.

The contract between the Brooks Group and Ms. LeVigne could hardly be less clear on the subject of how much money she is owed on a given commission. Ms. LeVigne's compensation is outlined in a rider attached as "Exhibit A" to the ICA. In relevant part, this rider

---

[34] Doc. Nos. 67-4–6, Exx. CC–II to Sweetser Decl.

[35] Doc. No. 67 at 4–5.

13

states "You are eligible for commissions on sales you generate of 20%. If significant Partner level resources are required to complete the projects, a pre-determined amount will be deducted from the commissions since Partners are non-commissioned. For example, if you close a training engagement that requires a Partner to facilitate, this is an expense to the Company and is calculated towards the payments you receive."[36]

Ms. LeVigne asserts without any factual support that she is entitled to the full 20% commission on the projects she generated. However, the contract is plainly ambiguous as to whether Ms. LeVigne is entitled to a 20% commission on any particular sale, since the Court cannot determine whether "significant Partner level resources are required to complete the projects," which would mandate an indeterminate reduction in Ms. LeVigne's pay.

Moreover, even assuming (since the Brooks Group does not raise the issue) that there was no partner involvement in the disputed contracts, Ms. LeVigne cannot sustain her burden at summary judgment that she is entitled to the full 20% commission. Under Pennsylvania law, "'The question of the right of a person employed under a contract providing for commissions based upon amounts collected, to commissions on collections made after termination of the employment . . . where the collections arise out of business secured during the term, is almost entirely dependent upon the wording of the particular contract involved and the construction to be given thereto.'"[37] Ms. LeVigne correctly argues, in the absence of contrary language, "ordinarily a person employed to sell personal property is entitled to his commission when he

---

[36] Doc. No. 55-2 at 8.

[37] *Levan v. Royal Paper Products, Inc.*, 185 A.2d 801, 802 (Pa. Super. 1962) (quoting 65 A.L.R. 993).

obtains an order which is accepted by his employer."[38] However, it is perfectly lawful for parties

to agree to a different payment schedule than this default rule that the law supplies.[39]

Turning to the language of the entire commission provision, the Court holds that the

provision is ambiguous. It could be read to imply that Ms. LeVigne was to be paid on

completion, since it states, "[I]f you close a training engagement that requires a Partner to

facilitate, this is an expense to the Company and is calculated towards the payments you

receive." The example could be read to imply that the person who closed the engagement would

not get paid until after the account is serviced, since the agreement requires a deduction from

"the payments you receive" rather than reimbursement to the company after payment is made.[40]

At the same time, the previous clause refers to a "pre-determined" amount to be deducted from

commissions when significant Partner-level resources are required, which could imply that the

commissions are determined before accounts are serviced. In short, the provision does not clearly

and expressly state when the commissions are due. Therefore, the Court believes that parol

evidence including the parties' course of dealing may be admissible, and a factfinder must

---

[38] *Wilson v. Homestead Valve Mfg. Co.*, 217 F.2d 792, 798 (3d Cir. 1954).

[39] *Little v. USSC Grp., Inc.*, 404 F. Supp. 2d 849, 854–55 (E.D. Pa. 2005) ("[U]nder the law parties sui juris bind themselves by their lawful contracts, and the courts cannot alter the contracts because they may work a hardship or later seem unfair to one of the parties.").

[40] Moreover, it is not at all clear that Ms. LeVigne is the kind of salesperson to whom the general rule in Pennsylvania concerning the time a commission is due applies. *Wilson v. Homestead Valve Mfg. Co.*, 217 F.2d 792, 798 (3d Cir. 1954) ("But the terms of the contract do not support plaintiff in the position that he was a commission salesman within the meaning of this rule with respect to the sales here involved. On the contrary it is clear that he was to be primarily as sales manager not a salesman."). The rule clearly applies to people whose job is limited to selling, as agent, a principal's goods. But Ms. LeVigne was both a salesperson in the sense that she sold the Brooks Group's services and a marketing consultant in that she worked on the projects she sold. LeVigne Decl., Doc. No. 67-1 at ¶ 3 ("While the ICA was in place, I provided sales support to Brooks Group and managed those projects coming in due to my sales activity, as well as providing strategy, research, training, and facilitation support to projects sold by others at Brooks Group."). Because there are factual issues related to the percentage Ms. LeVigne would be entitled to, the Court need not determine whether she is entitled to the presumption that she should receive commissions at the time of a sale rather than on completion of the services sold.

determine the terms of the contract, and Ms. LeVigne is not entitled to summary judgment on her breach of contract claim.[41]

### B. Unjust Enrichment

The Brooks Group's unjust enrichment claim is factually identical to its contract claim, and therefore under Pennsylvania law, it must be dismissed.[42] The same is true of Ms. LeVigne's unjust enrichment claim.

### C. CFAA and Privacy Claims

#### 1. CFAA

Defendants have moved for summary judgment on the Brooks Group's Computer Fraud and Abuse claim. To state a claim for violation of the Computer Fraud and Abuse Act ("CFAA"), a plaintiff must establish that the defendant knowingly or intentionally "accessed a computer without authorization or exceeding authorized access."[43] The *only* evidence the Brooks Group points to are the Dropbox files Defendants produced in discovery. But nothing in these printouts supports the inference that Ms. LeVigne accessed the computers without authorization.

---

[41] The Brooks Group does not move for summary judgment on this claim, conceding that there are genuine issues of material fact.

[42] *Wilson Area Sch. Dist. v. Skepton*, 586 Pa. 513, 520 (2006) ("[I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract . . . ."); *see also Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 625–26 (E.D. Pa. 2010) (allowing unjust enrichment claim to coexist with contract claim only because parties disputed the enforceability of the contract). Although this claim in the Amended Complaint is brought against Defendant*s*, and therefore it could be read to state a claim against the Brannan Group for unjust enrichment, the Brooks Group's response in Opposition to Defendants' Motion for Summary Judgment clarifies that the only claims the Brooks Group is pursuing against the Brannan Group are Counts VIII and IX, which are pleaded as alternatives to one another, because, as the Brooks Group argues, "Either the Brannan Group was a party to the Agreement (as it was the Brannan Group that received all funds from the Brooks Group) or the Brannan Group was not a party to the Agreement but was aware of all the terms of the Agreement. In either event, the Brannan Group is culpable for either breach of the Agreement, or interference with the terms of the Agreement that LeVigne willingly entered into." Doc. No. 65 at 20. The Brooks Group makes no argument with respect to unjust enrichment against the Brannan Group, and any such argument is therefore waived.

[43] 18 U.S.C. § 1030(a)(2). Different prohibitions in CFAA are worded differently, but all of them require the defendant either knowingly or intentionally to access a protected computer without authorization or in excess of the authorization.

Because there is no evidence that Ms. LeVigne accessed the information without authorization, the fact that she allegedly improperly retained the information after her relationship with the Brooks Group ended does not give rise to an action under the CFAA. The CFAA protects people from unauthorized *access* to computers, for example by hacking or stealing a password.[44] The CFAA does not protect against violations of corporate intellectual property policies.

Therefore, Defendants are entitled to summary judgment on this claim.[45]

### 2. Email-Related Counterclaims

The Brooks Group and Mr. Brooks have moved for summary judgment on Defendants' allegations of violations of the Electronic Communications Privacy Act ("ECPA"),[46] its Pennsylvania analogue, and Ms. LeVigne's federal and state constitutional right to privacy.

#### a. Statutory Claims

The ECPA and its Pennsylvania counterpart are "interpreted in the same way."[47] The crucial question to answer in assessing whether Ms. LeVigne's complaint survives summary

---

[44] *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 407 (E.D. Pa. 2009) ("[A]n employee who may access a computer by the terms of his employment is 'authorized' to use that computer for purposes of CFAA even if his purpose in doing so is to misuse or misappropriate the employer's information."). The CFAA also prohibits exceeding one's authorized access to a computer in ways not limited to hacking or password-stealing, but again, the statute focuses on the scope of a person's access to a computer, not on retention of intellectual property to which the person had access at the time of the appropriation.

[45] The Amended Complaint also alleges that LeVigne, the Brannan Group, and "other [unspecified] members of Defendant's [sic] so-called Nexus Global Solutions group" acted in concert with one another "to accomplish unlawful transfers of The Brooks Group's protected information." Doc. No. 22 at 19 ¶ 105. Defendants have moved for summary judgment on this civil conspiracy claim. The Brooks Group responds in a wholly conclusory fashion, arguing that "it was not fortuitous or accidental that Defendants performed acts in agreement with others for the purpose of misappropriating The Brooks Group's protected information." Doc. No. 65 at 18. Defendants are entitled to summary judgment on the Brooks Group's conspiracy claim both because the Brooks Group points to no evidence whatsoever from which a factfinder could conclude that either Defendant was a part of a conspiracy and for the same reasons that they are entitled to summary judgment on the Brooks Group's substantive claims under a breach of contract or CFAA theory that Defendants misappropriated Brooks Group intellectual property.

[46] 18 U.S.C. §§ 2701, 2707.

[47] *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 n.6 (3d Cir. 2003).

judgment is: absent actual damages, can Ms. LeVigne sue?[48] In creating a private right of action for violating the ECPA, the statute provides that a "person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity . . . which engaged in that violation such relief as may be appropriate."[49] The statute goes on to state that "[t]he court may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000."[50]

The plain language of the statute thus suggests that where there is a knowing or intentional violation of the ECPA, a plaintiff may recover from the violation, and if successful will always recover at least $1,000. However, in *Doe v. Chao*,[51] the Supreme Court interpreted the Privacy Act of 1974, a different statute with similar language, as requiring a showing of some

---

[48] "Actual damages" means something more than harm that "satisfies the injury-in-fact and causation requirements of Article III standing," *Doe v. Chao*, 540 U.S. 614, 624 (2004). Here, an alleged invasion into Ms. LeVigne's private email, redressable by statutory damages, is sufficient for Article III standing. However, Ms. LeVigne's argument that she has suffered actual damages is feeble. First, the damages she alleges in the Amended Counterclaims and Third Party Complaint are unspecified and unsupported by meaningful factual allegations. In her opposition to Brooks's Motions, she asserts that she has suffered damages from having to defend against this lawsuit, which is premised on information Brooks obtained from allegedly wrongfully accessing her email. However, any attorneys' fees she may be entitled to should be "pursued by means of a motion for attorneys' fees submitted within 30 days of [a] ruling as required by Federal Rule of Civil Procedure 54(d)(2)." *Montville Twp v. Woodmont Builders, LLC*, No. 03-cv-2680, 2010 WL 2326212, at *7 (D.N.J. June 7, 2010). The Court will not allow Ms. LeVigne to obtain attorneys' fees prematurely by recasting them as damages suffered from an ECPA violation. Ms. LeVigne also argues that she suffered damages from Brooks's accessing her email because Brooks was able to use her intellectual property to solicit an account worth $250,000. In support of this assertion, she cites her counsel's declaration, which in turn cites a page of a deposition of one Dan Brooks, where he testified that "the company" used a certain "document or the same type of slide" "in business with" Allergan, and that the company ended "up getting the business." Dan Brooks Dep. Aug. 14, 2012, 73:9–20, Doc. No. 91-3 at 29. Notably, the excerpted deposition says nothing about what the document is, where it came from, whether it was accessed from Ms. LeVigne's email, whether the document was instrumental in getting the business, or whether Ms. LeVigne would have obtained the business if Brooks had not. Therefore, even if this loss of business were alleged in the complaint, the factual matter Ms. LeVigne cites would be insufficient for the claimed damages to survive summary judgment.

[49] 18 U.S.C. § 2707(a).

[50] 18 U.S.C. § 2707(c).

[51] 540 U.S. 614 (2004).

"actual damages" in order to receive the statutory minimum. The Privacy Act states that when an agency fails to comply in certain respects with the Act or the regulations promulgated thereunder, an "individual may bring a civil action against the agency."[52] In an action "in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000."[53] The Supreme Court's reasoning that the plaintiff must have suffered "actual damages" was that only "a person entitled to recovery" was entitled to the $1,000 minimum. Only a person who had suffered actual damages was a person entitled to recovery because the United States was liable for "the sum of actual damages," even though that sum could in no event be less than $1,000.

Although a superficial reading of *Doe* supports the idea that under the ECPA, only a person who has suffered actual damages is a person entitled to recover, the *Doe* analysis includes some cautionary language that renders the case inapplicable to the ECPA. The Supreme Court considered an argument that "because analogous common law would not require [Doe] to show particular items of injury in order to receive a dollar recovery" it makes sense to award statutory damages under the Privacy Act absent a showing of actual damages.[54] The Supreme Court rejected this argument because an uncodified section of the Privacy Act created a commission to investigate whether the United States should be liable absent a showing of actual damages; this commission would have been pointless if the Act already subjected the United States to the liability the commission was designed to investigate. No similar section of the ECPA illuminates

---

[52] 5 U.S.C. § 552a(g)(1).

[53] 5 U.S.C. § 552a(g)(4)(A).

[54] 540 U.S. at 621.

that statute's meaning. A second reason not to apply *Doe* to the ECPA is that the Supreme Court considered the ECPA in *Doe*. Doe argued that because the ECPA's language is similar to the Privacy Act and the ECPA's legislative history suggests that recovery is available absent proof of actual damages, the Privacy Act should also be read to allow the statutory minimum without proof of actual damages. The Supreme Court stated that "the trouble with Doe's position is its reliance on the legislative histories of completely separate statutes passed well after the Privacy Act."[55] Notably, the Supreme Court did not reject Doe's argument as being incompatible with the text of the ECPA.

Another reason not to hold that actual damages are required under the ECPA is that its structure and language are materially different from that found in the Privacy Act. The Privacy Act states that when the United States violates the act, an "individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."[56] This section that creates the right of action is silent on the subject of when and what a plaintiff is entitled to recover. A later section states that when an agency willfully violates specific sections of the Act, "the United States *shall be liable* to the individual in an amount equal to the sum of actual damages . . . but in no case shall a person entitled to recovery receive less than the sum of $1,000."[57] The "damages" section of the Privacy Act can be read to define the scope of liability of the United States, on which subject section 552a(g)(1) is silent.

---

[55] *Id.* at 626.

[56] 5 U.S.C. § 552a(g)(1).

[57] 5 U.S.C. § 552a(g)(4) (emphasis added).

By contrast, in section 2707(a), the ECPA creates a private right of action by stating that any "person aggrieved by"[58] a knowing or intentional violation of the statute "may, in a civil action, recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate."[59] Thus, a person aggrieved who establishes a knowing or intentional violation is entitled to some recovery under the statute by virtue of section 2707(a)'s own force. Section 2707(c), the "damages" section of the statute, provides the extent of the recovery available to a person entitled to recovery under (a): "The court may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000."[60] Thus the ECPA's damages section imposes no liability independent of 18 U.S.C. § 2707(a), but it provides a method of damages calculation, which in no event shall be less than $1,000.

This interpretation is in line with the clear weight of authority on the ECPA,[61] as well as with the only other case from this district to address this issue that the Court's own research has

---

[58] 18 U.S.C. § 2807(a). "Aggrieved" is a term of art encompassing "any plaintiff with an interest arguably [sought] to be protected by the statute[.]"*Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 870 (2011) (internal quotation marks omitted; first alteration in original). Since the ECPA is designed to protect email users against interference with their private affairs, Ms. LeVigne—taking her allegations as true—is "aggrieved" within the meaning of the statute.

[59] 18 U.S.C. § 2707(a).

[60] 18 U.S.C. § 2707(c).

[61] *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 759 F. Supp. 2d 417, 427–28 (S.D.N.Y. 2010) ("Defendants need not allege actual damages when a plain reading of the statute, and the legislative history associated with the statute, make it clear that Congress intended that damages under Section 2707(c) be at least $1,000 per violation."); *Shefts v. Petrakis*, 931 F. Supp. 2d 916, 918 (C.D. Ill. 2013) ("In § 552a(g)(4), the restrictive language *shall be liable* seems to dictate actual damages as the only remedy in that clause, whereas in § 2707(c), the language that the court *may* assess the sum of actual damages and any profits seems to offer that formula as one means of calculation."); *Freedman v. Town of Fairfield*, No. 03-cv-01048, 2006 WL 2684347, at *3 (D. Conn. Sept. 19, 2006) ("*Doe* is dubious authority for the proposition that Section 2707(c) does not mean what it provides, recovery of 'minimum statutory damages of $1,000.'"); *Cedar Hill Associates, Inc. v. Paget*, No. 04-cv-0557, 2005 WL 3430562, at *3 (N.D. Ill. Dec. 9, 2005) ("[The legislative history] reasonably distinguishes the ECPA and the Privacy Act and underscores that the damage that the ECPA seeks to prevent is an invasion of

found.[62] Such contrary cases as exist do not persuade the Court to hold otherwise.[63]  Considering the language and structure of the statute, the weight of authority,  and especially the Supreme Court's own distinction of the ECPA from the Privacy Act, this Court agrees with most other courts to consider the question and holds that Ms. LeVigne need not allege actual damages to state a claim under the ECPA.

Turning to whether Ms. LeVigne's ECPA claim can withstand summary judgment, the parties dispute whether Brooks improperly accessed two of Ms. LeVigne's email accounts. It is undisputed that Brooks has many emails addressed to Ms. LeVigne, but Brooks claims it holds these emails lawfully because Ms. LeVigne set up her email addresses to forward automatically

---

privacy, not merely instances where a transgressor capitalizes on such an invasion." (internal quotation marks omitted)); *Maremont v. Susan Fredman Design Grp., Ltd.*, No. 10-cv-7811, 2014 WL 812401, at *7 (N.D. Ill. Mar. 3, 2014) ("Having thoroughly examined the issue and in light of the most recent decision from the Central District of Illinois on the issue, the Court agrees with Maremont and those courts that have held that a plaintiff need not prove actual damages in order to be entitled to statutory damages for an SCA violation.").

[62] *Voicenet Commc'ns, Inc. v. Corbett*, No. 04-cv-1318, 2006 WL 2506318, at *7 (E.D. Pa. Aug. 30, 2006) ("[E]ven if an ECPA plaintiff's actual damages are nominal, he is entitled to receive at least $1,000 in a successful suit."). This statement was made in passing during a discussion of whether the ECPA provides a comprehensive remedial scheme for purposes of determining whether it preempts § 1983 claims. Although it is not accompanied by extensive analysis on the precise point of whether actual damages must be proved, the case is persuasive authority.

[63] The leading case that applies *Doe* to the ECPA is *Van Alstyne v. Electronic Scriptorium, Ltd.*, 560 F.3d 199 (4th Cir. 2009). That case, from the Fourth Circuit, did not appropriately consider the Supreme Court's explicit distinction between the statutes' legislative histories or the provisions of the Privacy Act establishing a commission to study whether statutory damages should be available absent actual damages. Its rejection of the argument that Section 2707(a) creates a right to recovery while subsection (c) defines the recovery as a minimum of $1,000 is unpersuasive because it conflates damages calculation (subsection (c)) with substantive liability (subsection (a)). This Court will therefore not follow *Van Alstyne*.
A case that could be used in support of Brooks's argument that is binding on this Court is *Pichler v. UNITE*, 542 F.3d 380 (3d Cir. 2008). That case construed the Driver's Privacy Protection Act ("DPPA"), which provides that in the case of a violation "[t]he court may award actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b). In holding that actual damages were not necessary to sustain an award of statutory damages, the Third Circuit distinguished *Doe* as having held that under the Privacy Act "[o]nly a 'person entitled to recovery' of actual damages can qualify for a statutory damage award. The DPPA, however, contains no such 'critical limiting' language, [*Doe*, 540 U.S.] at 626, suggesting that a person need not prove actual damages to receive liquidated damages." *Pichler*, 542 F.3d at 398. But the Third Circuit was not considering the ECPA, and the DPPA has language radically different from the ECPA and the Privacy Act. Therefore, the Third Circuit had no occasion to consider whether the ECPA's different structure; its absence of a statutory commission to examine damages; and its distinct legislative history all militate in favor of holding that the ECPA provides for statutory damages without a showing of actual damages. These factors persuade the Court that the Privacy Act is significantly different from the ECPA in ways that are not relevant to the DPPA discussion, and therefore *Pichler*'s discussion of *Doe* is not relevant to this Court's understanding of the ECPA.

to an address provided by the Brooks Group. Ms. LeVigne testified at her deposition that she "never . . . redirected emails to Brooks."[64]

Brooks argues that its expert conclusively demonstrated that Ms. LeVigne had set up automatic forwarding to Brooks, and in support of this factual assertion cites the Certification of its expert, Paul Douglas Herrmann.[65] But the paragraphs cited merely call into question the contention of Defendants' expert that the emails were definitely not set up for automatic forwarding. The first paragraph describes Defendants' expert's conclusion, and the second states, "The Walker Certification however failed to inform the Court that the scores of email addressed solely 'TO' the 'wendi.levigne@mac.com' email account contained in the two PSTs reach back to February 10, 2010, almost two years before Ms. LeVigne's departure from Brooks Group."[66] Although one reasonable inference from Herrmann's statement is that Ms. LeVigne had set up email forwarding to her Brooks Group account, the Court cannot draw that conclusion definitively. Notably, the expert himself never makes that conclusion; instead, he casts doubt on Defendants' expert report.[67] Since Ms. LeVigne has testified that she did not set up automatic forwarding and since the Brooks Group has not refuted that claim, the factual issue of whether she forwarded the emails is genuinely disputed.

Brooks further argues that it is entitled to judgment as a matter of law on Ms. LeVigne's ECPA claim because the emails were stored on the Brooks Group's servers, and therefore

---

[64] LeVigne Dep. Tr. 15:21–22 (Doc. No. 67-8 at 25).

[65] Doc. No. 69 at 7.

[66] Herrmann Certification at ¶ 6, Doc. No. 69-1 at 3.

[67] Defendants' Expert Report has been stricken. Doc. No. 83. Brooks also argues that discovery from Apple conclusively establishes that the only changes to Ms. LeVigne's @mac.com and @nexusglobalsolution.com accounts were made in California, where Ms. LeVigne resides. First, the exhibit cited is totally illegible and therefore cannot conclusively prove Brooks's point. Ex. V. to Brooks Group's Mot. for Summary Judgment, Doc. No. 69-1 at 33. Second, the expert summary of the Apple document states that it only establishes that the @mac.com email address was not hacked; it says nothing about the @nexusglobalsolution.com account. Ex. 69-1 at 4, ¶ 12.

Brooks must have obtained them lawfully. But Brooks is assuming what it is trying to prove. If Ms. LeVigne set up email forwarding in such a way that the emails resided on the Brooks Group's servers, then the Brooks Group's argument may have merit. But if Brooks obtained the emails nefariously, the fact that the emails ended up on the Brooks Group's servers would simply be the end result of their wrongdoing.

Brooks's means of accessing Ms. LeVigne's emails is genuinely disputed. It is also material. It is a violation of the ECPA intentionally to access "without authorization a facility through which an electronic communication service is provided."[68] The Pennsylvania analog prohibits intentional interception of "any wire, electronic or oral communication."[69] The manner by which Brooks gained access to Ms. LeVigne's email is an element of the cause of action under both statutes. The parties do not at the summary judgment stage dispute any other element, and therefore summary judgment is inappropriate on the statutory email-related counterclaims.

For his part, Mr. Brooks adds the argument that he "was acting in his capacity as a corporate officer of [the Brooks Group] when he viewed the emails on the Brooks Group email system. Such conduct was not wrongful or tortious and, therefore, Mr. Brooks cannot be held personally liable."[70] Mr. Brooks provides no authority for the proposition that a person acting in the capacity of corporate officer cannot be held liable for Defendants' causes of action, and the Court's own research has only disclosed cases that contradict the suggestion.[71] In his brief in

---

[68] 18 U.S.C. § 2701(a)(1).

[69] 18 Pa. Cons. Stat. Ann. § 5703(1).

[70] Doc. No. 90 at 1.

[71] *Pilot Air Freight Corp. v. Sandair, Inc.*, 118 F. Supp. 2d 557, 564 (E.D. Pa. 2000) ("The Sandlers, without citing any law, argue that summary judgment should be granted in their favor with respect to the claims brought against them individually. Their argument seems to be based on the belief that they cannot be held liable for the actions of Sandair. But, in Pennsylvania, employees and officials are liable for their own torts."); *see also Shefts v. Petrakis*, No. 10-cv-1104, 2012 WL 4049509, at *6 (C.D. Ill. Sept. 13, 2012) ("[T]he Illinois business judgment rule cannot immunize illegal activities by a corporate officer from a third-party victim's suit."); *Executive Sec.*

support of his Motion, he argues that he cannot be held liable absent wrongdoing, but of course, as detailed above, his wrongdoing is a genuinely disputed material fact. Therefore, summary judgment is inappropriate on the ECPA and related Pennsylvania claims.

### b. Constitutional Claims

LeVigne alleges that Brooks violated her federal and state constitutional rights of privacy. However, she alleges no governmental action, and therefore the claims cannot stand.[72] Summary judgment in favor of Brooks will be entered on these counts.

### D. *Other Claims Against LeVigne*

### 1. Fraud

The Brooks Group alleges that Ms. LeVigne committed fraud by inducing the Brooks Group to pay a contractor, Kevin Durr, $71,000, of which Durr would pay, unbeknownst to the Brooks Group, $21,000 to Ms. LeVigne.[73] The Brooks Group provides evidence of this scheme in the form of an email exchange between Ms. LeVigne and Durr. Ms. LeVigne writes:

---

*Mgmt., Inc. v. Dahl*, 830 F. Supp. 2d 883, 906 (C.D. Cal. 2011) ("[T]here is a question of material fact as to whether [corporate officers with authorization to access email accounts] 'exceed[ed]' their authorization to access Apex's emails under subsection (a)(2) [of the ECPA].").

[72] *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 620 (3d Cir. 1992) ("[W]e predict that if faced with the issue, the Pennsylvania Supreme Court would hold that the right of privacy protected by the Pennsylvania Constitution does not encompass invasions of privacy committed by private actors."). Even the broadest pronouncements of the federal right of privacy require state action to state a constitutional claim. *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) (holding that under various amendments to the Constitution "privacy is protected from *governmental* intrusion" (emphasis added)).

The parties' briefing treats these allegations as stating a claim under the tort of invasion of privacy, specifically intrusion on seclusion. But that tort is not alleged in the Amended Counterclaims or Third-Party Complaint, and therefore Defendants may not proceed on it.

[73] The Brooks Group also claims under the heading of "Fraud" that the purpose of this scheme was in part to misappropriate the Brooks Group's intellectual property. The Brooks Group fails to demonstrate that the allegedly misappropriated information was in any way proprietary to the Brooks Group. The only evidence the Brooks Group points to is Durr's deposition testimony where he states that "data from the Brooks Group" was "put into the MDR database." Durr Dep. Tr. at 59:10–21, Doc. No. 65-3 at 10. Without knowing what the data from the Brooks Group was, whether it was confidential, what the MDR database is, or whether the data was provided on the basis of a materially false statement made with scienter that caused damages, this testimony is plainly not enough to support a claim of fraud.

I put in an amount extra for my bus dev and client mgmt. efforts, since I don't get but a couple hundred $s on that one from Brooks, and this was our ability to build on clients dime. I also added a little extra for you, since I know you tend toward lower margins so I took the liberty of ensuring I included some extra for you.[74]

It is true that this email appears fishy. But even though frauds are fishy, not everything fishy is a fraud. The Brooks Group points to no false statement made by Ms. LeVigne that the Brooks Group relied on at all. Without these critical elements, the Brooks Group cannot survive summary judgment on this claim.

Therefore judgment will be entered for Defendants on the Brooks Group's fraud claim.

## 2. Lanham Act

The Brooks Group and Defendants have cross-moved for summary judgment on the Brooks group's claim that Ms. LeVigne has violated the Lanham Act. The Brooks Group claims that Ms. LeVigne misappropriated certain PowerPoint presentations and passed them off as her own in order to market her services to potential clients.

The Lanham Act[75] forbids falsifying the origin of goods or services. Even accepting that all the PowerPoint presentations that the Brooks Group identified were the Brooks Group's intellectual property, there is no evidence in the record that Ms. LeVigne passed off any service or good as her own that was actually the Brooks Group's. She was not selling PowerPoint presentations; she was selling consulting services.

The Brooks Group does not allege that Ms. LeVigne was selling consulting services that she could not provide or that she was using her affiliation with the Brooks Group to misrepresent either who would be providing consulting services or what those services would consist of. At

---

[74] Email of Wendi LeVigne to Kevin Durr, Nov. 28, 2011, 4:46 PM, Doc. No. 65-1 at 8–9.

[75] 15 U.S.C. § 1125.

most, as Defendants rightly point out, the Brooks Group is complaining of plagiarism, which is not a cause of action under the Lanham Act.[76]

The Brooks Group has pointed to no evidence in the record from which a factfinder could conclude that Defendants have violated the Lanham Act, and therefore summary judgment on this claim will be entered in their favor.

### 3. Unfair Competition

Defendants have moved for summary judgment on the Brooks Group's claim that her conduct amounted to unfair competition under Pennsylvania law. The Brooks Group argues that "Defendants [sic] misappropriation of the Brooks Group's materials and the passing off of these materials as their own, are more than enough to establish a claim for unfair competition" because the use of the Brooks Group's marketing materials would likely cause confusion between its services and Ms. LeVigne's.[77]

The Brooks Group has pointed to no evidence that suggests Defendants were passing off Brooks Group services as their own; at most Ms. LeVigne was using materials developed by the Brooks Group to market her own services, but there is no evidence that she affected to be affiliated with the Brooks Group in marketing her own services. Given the total lack of evidence mustered by the Brooks Group, the Court cannot perceive that Ms. LeVigne's presentations would engender confusion between Ms. LeVigne's services and the Brooks Group's sufficient to sustain an unfair competition claim.

---

[76] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 36 (2003) ("[R]eading § 43(a) of the Lanham Act as creating a cause of action for, in effect, plagiarism—the use of otherwise unprotected works and inventions without attribution—would be hard to reconcile with our previous decisions."). Under *Dastar*, "communicative products," like the PowerPoint slides here, are not "goods" for Lanham Act purposes and are thus "otherwise unprotected works" for which a cause of plagiarism will not lie. *Id.* at 36–37.

[77] Doc. No. 65 at 19.

Therefore, Defendants are entitled to summary judgment on the Brooks Group's unfair competition claim.

### E.    Claims Against the Brannan Group

Defendants have moved for summary judgment on the Brooks Group's claims against the Brannan Group. The Brooks Group's entire argument against the Brannan Group is:

> The Brannan Group is the entity that LeVigne opened up when she started working with the Brooks Group. Although the Brannan Group is not technically a party to the Agreement, LeVigne admits that it was an oversight that the Brannan Group was not added to the Agreement. Exhibit "M," LeVigne TR. at 41:19–42:11. The Brannan Group was the entity that received all payments from the Brooks Group. *Id.*
> The allegations as against the Brannan Group are pleaded in the alternative. Either the Brannan Group was a party to the Agreement (as it was the Brannan Group that received all funds from the Brooks Group) or the Brannan Group was not a party to the Agreement but was aware of all the terms of the Agreement. In either event, the Brannan Group is culpable for either breach of the Agreement, or interference with the terms of the Agreement that LeVigne willingly entered into.
> At all relevant times, the Brannan Group was aware of the Agreement as between the Brooks Group and LeVigne. Through its intentional acts, the Brannan Group interfered with the Agreement as between the Brooks Group and LeVigne, The Brannan Group's acts constitute intentional interference with the contractual relations of the Brooks Group and LeVigne.[78]

The Brannan Group was not a party to the ICA, and therefore it cannot have breached the ICA.[79] And the Brooks Group marshals literally zero facts in support of its argument that the Brannan Group interfered with the contract between the Brooks Group and Ms. LeVigne.

Therefore, Defendants are entitled to summary judgment on the counts against the Brannan Group.

## CONCLUSION

For the foregoing reasons, the cross-motions for summary judgment are granted in part and denied in part as follows:

---

[78] *Id.* at 19–20.

[79] ICA at ¶ 6.1.1, Doc. No. 55-2 at 8.

The Brooks Group's motion is granted with respect to Defendants' unjust enrichment claim (Count II of the Amended Counterclaim) and the constitutional invasion of privacy claim (Count VI of the Amended Counterclaim). The Brooks Group's motion is denied in all other respects.

Mr. Brooks's motion is granted with respect to the constitutional invasion of privacy claim (Count III of the Third Party Complaint) and denied in all other respects.

Defendants' motion is granted with respect to Count I of the Complaint insofar as that count alleges misappropriation of intellectual property and denied with respect to Count I insofar as that count alleges breach of paragraph 6.2 of the ICA. Defendants' motion is denied with respect to Counts I and II of Defendants' Counterclaims. Defendants' motion is granted in all other respects.

An appropriate Order follows.